# Rosehill Cemetery Company v. Wesley Dempster, et al.
## Gen. No. 11,999.

1. STOCK-HOLDERS—*what not essential to operation of estoppel
against.* It is not necessary that a stock-holders' meeting should be
held in order to bind or estop the stock-holders from questioning an
illegal act of the board of directors; but such an estoppel may arise
by laches, predicated upon knowledge, or means of knowledge not
availed of.

2. COMPENSATION—*when corporation cannot successfully attack,
made to an officer.* Where the directors of a corporation, all of whom
are large stock-holders and who together hold and represent a large
majority of the stock of such corporation, provide for the payment
of a special compensation to a salaried officer for a special and val-
uable service rendered by him, the corporation cannot successfully
maintain an action to recover the compensation so paid, even though
illegally provided for, in order that some innocent stock-holders or

stock-holders not estopped to complain may indirectly benefit thereby.

Bill for accounting. Appeal from the Circuit Court of Cook County; the Hon. MURRAY F. TULEY, Judge, presiding. Heard in this court at the October term, 1904. Affirmed. Opinion filed June 15, 1905.

EDWIN BURRITT SMITH and ROBERT F. PETTIBONE, for appellant.

CANNON & POAGE, for appellees.

**Per curiam.** December 4, 1899, appellant filed a bill against appellees, alleging therein, among other things, that the Rosehill Cemetery Company was duly incorporated under and by special acts of the General Assembly of Illinois, approved in 1859 and 1863. Soon after its incorporation it passed out of the control of its stockholders and into the hands of its creditors, who for many years and up to August, 1896, managed and controlled it in their own interests and in disregard of the rights of the stockholders. In the year 1881 a majority in amount of the stockholders entered into an agreement among themselves to begin and carry on proceedings to secure their rights as stockholders, and, in pursuance of this agreement, Killian V. R. Lansingh, administrator *de bonis non* of the estate of John Dempster, filed a bill in the Circuit Court of Cook county against Van H. Higgins, the complainant corporation and others, the other parties to the agreement becoming parties to the proceedings as intervening petitioners. Thereafter a decree was entered favorable to Lansingh. This decree was afterwards affirmed by the Appellate Court, and thereafter affirmed in part and reversed in part, in January, 1895, by the Supreme Court of Illinois.

The said Wesley Dempster and his partner, Samuel H. Sweet, together held 167 shares of the stock of complainant. Although they were parties to said stockholders' agreement, they took no active part in connection with the proceedings beyond contributing to the expenses, up to the time of the decision by the Supreme Court in 1895. The said Lansingh acted under said agreement for and on behalf of the entire

syndicate of stockholders, devoting a large part of his time for a period of fourteen years to their interests. All said stockholders, except only said Dempster, his brother David and said Sweet, agreed to and did compensate said Lansingh (each transferring to him one-third of his stock) for the services so rendered by him on behalf of all.

After the filing of the mandate of the Supreme Court in the Circuit Court on April 6, 1895, many hearings were had, and a decree was finally entered on November 22, 1895, in accordance with the judgment of the Supreme Court. This decree disposed of all the main questions involved in the litigation favorably to the complainants. A reference was had to the master to take an account of certain matters, being mainly as to over-payments by the company to the creditors. That after the mandate of the Supreme Court was filed in this court, April 6, 1895, and said cause had been on hearing many times in an attempt to have various unsettled questions adjudicated and a decree entered in accordance with the mandate, negotiations in behalf of the parties to said stockholders' agreement were had with Henry J. Furber, representing the creditors of the corporation, who had continuously held control of it for over thirty years. The said Wesley Dempster—acting for himself, his brother and said Sweet's estate and to further their interests—actively participated in these negotiations, but without any agreement for compensation or any idea on the part of the other parties to the stockholders' agreement that he would expect or demand compensation for his services, such services being voluntary for himself, his brother and said Sweet's estate.

The creditors represented by said Furber held a minority of the stock of the corporation; and, in the settlement made with them, the parties to the stockholders' agreement purchased and acquired for the corporation such minority stock (about 700 shares) for $70,000. The said Wesley Dempster, acting as trustee for the parties to the stockholders' agreement, entered into a contract with said Furber, providing, among other things, for such purchase.

Before assuming any liability to said Furber and his as-

sociates, said Dempster secured from the principal stockholders a written agreement binding them to indemnify him and pledging to him their stock (being practically all the remaining stock of the company) as further security for the obligation he was about to assume; also providing that, upon their coming into possession and control of the corporation, it would assume all rights, obligations and liabilities of said Dempster under said contract. This was afterwards done, and the corporation faithfully kept and performed the agreement so entered into between Dempster and said Furber. The settlement thus reached resulted in the termination of the litigation early in August, 1896. Thereupon the creditors of the corporation turned over the control thereof to its stockholders. The corporation assumed the contract of said Wesley Dempster with said Furber and duly paid and discharged, largely in advance, all the obligations assumed by said Wesley Dempster thereunder.

The parties to the stockholders' agreement (including Wesley Dempster), about the time they entered into control of the corporation, had an agreement among themselves to the effect that certain small adverse holdings, aggregating 47½ shares, of the stock still outstanding should be purchased and cancelled by and for the benefit of the corporation.

The said Wesley Dempster required the active parties of the stockholders' agreement and other stockholders to pledge their stock to him as indemnity to him for becoming nominally individually liable for the contract with Furber. He also had issued to himself personally, as further indemnity, 670 shares of the stock so purchased under the contract with Furber. He also had 5 shares of the stock so purchased issued to his son, Charles; which said 5 shares, reissued as 25 shares, the said Charles W. Dempster still holds. The said Wesley Dempster, while president of the corporation, purchased for his own account, in violation of the agreement of the stockholders above referred to, certain outstanding shares of stock owned by various small holders not members of the syndicate, making payments therefor, in some instances, with

money of the corporation improperly loaned to him by himself for that purpose.

The said Wesley Dempster, previous to September 14, 1896, represented to some of the stockholders that he, having devoted a considerable part of his time for a number of months to said negotiations, ought to be allowed, by way of compensation to him for time spent in the negotiations and the liability he had incurred, to purchase with his own funds 20 shares of stock of one William H. Turner, a member of the board of managers of the company, which stock was part of that to be purchased by the company as aforesaid. This suggestion seems to have been acquiesced in; but, when it was found that said Turner would not accept $2,000 and demanded $3,000 therefor, said Dempster abandoned his plan, and purchased said stock with funds of the company, taking title thereto in his own name. Two weeks later, at a meeting of the board of managers of the corporation, at which there were present William H. Turner, Killiam V. R. Lansingh, Charles W. Dempster, Henry L. Pitcher and C. L. Dempster, said Wesley Dempster, then treasurer of the company, being also present, procured the adoption of the following resolution:

"Resolved, That the Rosehill Cemetery Company issue to Wesley Dempster fifty shares of stock of said company, out of any which said company may have purchased, which amount shall be in full for said Dempster's services rendered in effecting a satisfactory settlement of the litigation between its stockholders and other matters relating to the welfare of said company."

Said resolution was adopted without the authority of the stockholders, and has never been ratified or confirmed by them individually or at any regular meeting of the stockholders.

Said Wesley Dempster was paid a salary of $300 per month for acting as treasurer of the corporation from the time the stockholders recovered control until some time after the passage of said resolution. Thereafter he became pres-

ident of the corporation, receiving the same salary. He had rendered no services to the company for which he had not been fully paid; the services which he voluntarily undertook on behalf of the stockholders who had joined in the stockholders' agreement were rendered on behalf of himself, his partner and brother. They were entirely voluntary and were rendered without any agreement for compensation or expectation on the part of the other stockholders that any compensation would be required. The compensation which said Wesley Dempster received as treasurer of the corporation, $300 per month, was a large compensation for the time devoted by him to the business of the corporation. At the time of the passage of this resolution, making a gift to said Dempster, said Turner had parted with all his stock; said Charles W. Dempster was not the owner of any stock, and had no pecuniary interest in the corporation; and all of the stock of Lansingh, Pitcher and C. J. Dempster and the other stockholders was pledged to said Wesley Dempster as aforesaid. By reason of the issuance to said Wesley Dempster of the 690 shares of stock purchased by the corporation from Furber and Turner, there was at this time standing in the names of Wesley Dempster, his brother David, and the executrix of his then late partner, Samuel H. Sweet, a majority of all the stock of the corporation. Thus the said Wesley Dempster was at that time in control of the corporation and its managers then acted entirely as he requested and directed. The value of the stock of the corporation, thus attempted to be given to Wesley Dempster, was at that time and still is not less than $25,000. Said Wesley Dempster, claiming under said resolution, retained the 20 shares of stock so purchased by the corporation from Turner and 30 shares of stock so purchased by it from Furber; and he thereafter, in 1898, when the stock of the company was reissued, five for one, caused the same to be reissued to himself at 250 shares of the present issue.

The said Wesley Dempster and his son, Charles W. Dempster, using trust funds of the corporation, purchased and caused to be issued to said Charles W. Dempster 3 shares of

outstanding stock, which under the stockholders' agreement was to be purchased for the corporation. Said 3 shares of stock and said 5 shares so improperly issued to Charles W. Dempster were subsequently reissued as 40 shares to said Charles W. Dempster.

The said Wesley Dempster wrongfully caused to be issued to himself 8¾ shares of the outstanding stock, although the original certificates were pledged and held by said Lansingh for the payment of certain debts of a former owner, in violation of a rule of the corporation forbidding the reissue of any stock without the cancellation and surrender of the certificate or certificates to be reissued.

The said Wesley Dempster, from August 4, 1896, when the stockholders came into possession of the corporation, until April 3, 1899, controlled the corporation and held possession of its books, papers, securities and stock certificates. Until late in 1898, all the stock of the corporation was held by or was pledged to Wesley Dempster. Upon April 3, 1899, the stock of the corporation, being then released from all obligations to said Wesley Dempster, and by the discharge by the company of all the obligations so assumed by said Wesley Dempster, and all but 50 of the shares so purchased from Furber and Turner and placed in said Wesley Dempster's name having been cancelled, a stockholders' meeting was held, at which a new board of managers was elected and the affairs of the corporation taken out of the control of said Wesley Dempster. Said new board of managers thereafter investigated the management of the corporation when under the control of said Wesley Dempster, and instituted this proceeding by the corporation.

The bill prays for a discovery and accounting; that the defendants deliver up to be cancelled all certificates of stock improperly obtained or held by them or wrongfully issued to them, or either of them, and especially that said Wesley Dempster be decreed to deliver the certificates for 250 shares of stock of the present issue purchased by the corporation from said Furber and Turner, and now wrongfully and fraudulently held by said defendant; that said Charles W.

Dempster and Wesley Dempster deliver up the shares of stock so wrongfully purchased by them from former holders in violation of the agreement of the stockholders that it should be purchased by and for the benefit of the corporation—the complainant offering to do equity by paying the purchase price for said stock, with interest thereon, less dividends received by the defendants—and that said Wesley Dempster be required to account for the dividends received by him on said 250 shares of stock.

Appellees answered said bill, specifically denying all alleged wrong doing and admitting in substance the statements of the bill in respect to the history of the litigation instituted and carried on by the stockholders of the Cemetery Company. They allege that during the proceeding the said Wesley Dempster took the matters in controversy in hand at the request of the parties to the stockholders' agreement, and that his services extended over a period of about six months and consumed a great deal of thought and urgent labor; and said Wesley Dempster says "that it was not a part of his agreement that he should not be paid for his services," and that it was never contemplated or expressed that he should do the work and pledge his credit without compensation. They allege that said Wesley Dempster used his own funds and pledged his own estate and credit in the sum of about $70,-000 for the purpose of bringing about a satisfactory settlement; that this was done while the affairs of the company were in such a pecuniary condition that it was necessary to procure some person of business ability and large estate to place the company in a condition to make the respective interests of the parties to the agreement of fair value; and that by the acts of said Wesley Dempster the interests of the respective parties to said agreement did greatly increase in value.

The defendants deny that they wrongfully purchased for their own account said outstanding shares of stock in violation of any agreement among the parties to the stockholders' syndicate. They deny all charges of improper action by said Wesley Dempster to control the corporation. They contend

that "said complainant company and the officers and members of the board, in consideration of the valuable services rendered said company by said Wesley Dempster, caused to be issued to him in compensation therefor fifty shares of stock, which, at that time, were of small value compared with the services rendered." They allege that said complainant is freed and discharged from all obligations to said Wesley Dempster, but allege that it discharged itself therefrom by paying to him said 50 shares of stock, represented by 250 shares of the present issue; and that said Wesley Dempster is now the absolute owner of said 250 shares. They further allege that, at the time said 50 shares were issued to said Wesley Dempster, they were of the value of $5,000, and were not excessive compensation for the services rendered.

The defendants admit that they purchased several small blocks of outstanding stock for their own account; but allege that they had a perfect right to do so, there being no obligation or agreement to the contrary.

The cause was referred to a master in chancery to take proofs and to report the same, with his opinion on the law and the evidence. The master's report was filed July 6, 1903, in which he recommends that the bill be dismissed for want of equity. The objections to such report were duly filed as exceptions thereto, and were fully argued before Judge Tuley of the Circuit Court in the month of October, 1903. After holding the case under advisement for several months, the learned chancellor handed down the following opinion:

"Upon a revision of the evidence and arguments in this case, I have come to the conclusion:

That if ever there was a case where, upon equitable principles, a person should be compensated for services rendered a corporation, there being no express agreement made beforehand to pay for the same, this is one.

There had been thirteen or fourteen years of litigation between Lansingh and other parties he represented, called the 'Syndicate,' holding 'certificates of interest' in the property of

the Rosehill Cemetery Company, which, in 1895, resulted in a final decree, holding, among other things, that the holders of such certificates of interest were equitable assignees of the stock of the corporation, and that they were equitably entitled to redeem such stock, which had been placed in the hands of Judge Blodgett as trustee, to secure the payment of the mortgage indebtedness of the corporation. Each certificate represented one 1/1,500 interest in the property of the corporation.

The Cemetery Company started its operations upon land heavily mortgaged on the ........ day of ............; in the year 1859, entering into an agreement with the holders of the mortgage indebtedness by which it was allowed to carry on the cemetery upon certain conditions, and placed all of its stock in the hands of a trustee to secure the payment of the mortgage indebtedness.

The certificates of interest were sold in the open market for the means with which to carry on the operations of the company, and certified on their face, in substance, that, on the return of the pledged stock to the corporation, the holders of a certificate of interest would be entitled to a *pro rata* division of the returned stock.

The decree of this court, among other things, in substance, held, that the complainant was entitled to an accounting as to matters charged in the bill to ascertain whether the said mortgage debt had been paid and discharged.

The decree was affirmed by the Supreme Court, except in one or two particulars, and remanded for further proceedings in accordance with an opinion covering over sixty pages. The contest was a long and bitter one, and when the case was returned from the Supreme Court and redocketed, the question of an accounting running through a period of more than twenty years (together with other certain complications not necessary to specify) gave promise of an extended and expensive further litigation.

The case in the Supreme Court is found in the Illinois Supreme Court Reports, Vol. 154, Lansingh v. Higgins, 301 to 393.

Van H. Higgins, the principal owner of the mortgage indebtedness, died before the case was redocketed in this court, and Furber (who owned the remainder) for himself and Mrs. Higgins, administratrix and legatee, made overtures to the 'syndicate' looking to an amicable accounting and settlement of all their difficulties, but without any success whatever.

In January, 1896, Wesley Dempster (who was the holder of certain certificates of interest, and who, refusing to enter into the syndicate agreement, had contributed to the *pro rata* share of its expenses), was called upon by Furber to see if he, Wesley Dempster, could not bring about an amicable accounting and settlement between the parties litigant.

He communicated with the syndicate and was urged by it to undertake a settlement. It appeared that the syndicate had, in its numbers, no one who had such financial position as to obtain the confidence of Furber, while Wesley Dempster, by his superior business qualifications and financial ability, was enabled to successfully carry on the negotiations for a settlement. Wesley Dempster met with Furber almost daily for over eight weeks, and was in constant communication and consultation with the syndicate.

The litigation had been managed and directed by Lansingh, who had an agreement with nearly all of those who constituted the syndicate, for the payment to him of one-third of the amount realized by the litigation, but what was known as the syndicate (at the head of which was Lansingh) controlled practically all the outstanding certificates of interest at the time that the settlement was arrived at between Furber and Wesley Dempster, all but 45 shares.

In March, 1896, a tentative agreement as to a settlement was arrived at, but great difficulty was found in getting the same into shape so as to bind the Rosehill Cemetery Company, the mortgagees and the holders of the certificates of interest.

There was then no existing board of directors of the Cemetery Company. While those holding certificates of interest were the equitable owners of the stock, they could not vote

the same, because the legal title to the same was in Blodgett
as trustee for the owners of the mortgage indebtedness, and
the holders of such certificates (which, as I have stated, were
practically all in the syndicate) could not elect a new board
of directors without the consent of the mortgagees and
trustee.

Furber was evidently distrustful of the syndicate with
whom he had found it impossible to come to any understand-
ing or amicable settlement.

An agreement in writing as to the accounting and settle-
ment between the Higgins-Furber interest and the owners of
the certificates of interest, was not consummated until July,
1896. Under this agreement, Wesley Dempster was to take
the practical management and control of the corporation
until the $195,000 (which was the amount arrived at to be
paid to the Higgins-Furber interest) · had been fully dis-
charged.

A meeting of the stockholders was called and held in Au-
gust, 1896, for the election of a board of directors of the
Cemetery Company, at which election Lansingh was elected
president, and Wesley Dempster secretary and treasurer.
The trustee holding the pledged stock did not attend such
meeting.

September 14 a resolution was passed by the board of di-
rectors, authorizing the issue of 50 shares of stock to Wesley
Dempster in consideration for the services referred to.

It appears there was then no treasury stock in the treas-
ury of the company, and it is apparent from the resolution
that it was contemplated that the stock should be issued when
received by the corporation.

A certain 108 shares of stock were subsequently turned
over to the corporation by the Higgins-Furber interest, and
of this 108 shares of stock were subsequently issued, 50 shares
to Wesley Dempster and 50 shares to Osborne, the attorney,
under a resolution passed by the board of directors the 28th
of August preceding, and also shares were issued to Petti-
bone, also one of the attorneys. All of these shares of stock
appear to have been issued at one and the same time.

Osborne was a stockholder at the time that resolution was passed to issue the 50 shares to Wesley Dempster.

There is evidence tending to show that Lansingh, C. J. Dempster and others, members of the syndicate, declared during the progress of the negotiations between Furber and Wesley Dempster, that the latter ought to be well paid for his services.

The evidence tends to show that the principal managing members of the syndicate, if not all the members thereof, had knowledge of the negotiations as they were carried on and were much pleased with the successful efforts of Wesley Dempster. They might well be, as it is evident that his services were valuable to all those having any stock (certificates of interest) in the Cemetery Company.

It is a fair inference from the evidence that no one, except Wesley Dempster, could have effected so prompt and advantageous a settlement.

The value of the stock at the time it was voted to Wesley Dempster was about $100 a share, but even had it been worth double that amount, it would not have been excessive compensation under the circumstances, for his valuable services.

In the passage of the resolution there appears to have been no concealment or secrecy about it. The master has found, in substance, that there was no collusion or fraud, but that it was the voluntary action of the directors under the belief that it was a just and fair compensation to Wesley Dempster for the services which he had performed.

It does not appear from the evidence that there was any influence brought to bear by Wesley Dempster, or any influence of any kind used in any way whatever to control the actions of the board in passing the resolution. There is some effort to show that Lansingh was coerced into voting for the resolution, and that Fitcher (one of the directors who, pending the negotiations, had bought a certificate of interest at the suggestion of the syndicate) did not fully understand the effect of his act, but, in the light of all the evidence, the same is not worthy of serious consideration.

The act of the board was only a recognition of the fact that a fair compensation was due Wesley Dempster for the benefits he had conferred upon the actual owners of the corporation—holders of the certificates of interest—in bringing about a settlement, whereby and without further litigation they could come into control of the corporation at once, instead of being forced to wait until an accounting running through a period of more than twenty years could be had. They were, under the settlement agreement, let into control before the mortgage debt was paid, but, under the terms agreed upon, the mortgagee's interests were protected.

The syndicate, which then embraced practically all the holders of certificates of interest, except about 25 shares, had succeeded in obtaining control of the corporation after nearly fourteen years' litigation, and it is not surprising that they felt very grateful to Wesley Dempster for his services.

It appears that the 50 shares of stock was voted to Mr. Osborne, the attorney, about two weeks before action was taken as to the stock voted Wesley Dempster, but both were issued at the same time. Osborne was the solicitor of the syndicate and performed great and valuable service in the litigation referred to, but, like Wesley Dempster, he was not employed by the corporation. At the time the services were rendered by each, Osborne and Wesley Dempster, the corporation was in adverse control; they could not have made any agreement with the corporation for the services that were rendered, as those services were directly adverse to the interests of those in control of the corporation.

As a compensation for the benefits received, the amount voted to each, Dempster and Osborne, was very reasonable, in my opinion, and they were each equitably entitled to receive the same, whether they could have maintained an action at law to recover for the services rendered or not.

It appears that the business of the corporation was so well and successfully managed by Dempster that in the fall of 1899 the indebtedness due the Higgins and Furber interest was fully paid, and the mortgage was discharged. The holders of the certificates of interest then became not only the

equitable owners of the stock of the Cemetery Company, which had been placed in the hands of Blodgett as trustee to secure the payment of the mortgage, but also became the legal owners of the pledged stock, and then, and not before, became the absolute and only stockholders of the Cemetery Company, with full power to control the same as such.

Upon coming into such full and absolute control, a resolution in effect repudiating the prior action of the board of directors of September, 1896, was passed, and in accordance with that resolution this suit was commenced by bill filed the 4th of December, 1899, to compel the return of the 50 shares of stock voted Wesley Dempster, and also to make him account for certain so-called 'outstanding shares' not owned by the syndicate which Wesley Dempster purchased at different times after he commenced his negotiations with Furber.

As to the outstanding shares of stock, it is sufficient to say that the weight of evidence is against the contention of complainants that there was any understanding or agreement that such outstanding shares should be purchased by the company or for the company or for the syndicate, and that as to such outstanding shares so purchased by Wesley Dempster, he was under no legal or moral obligation to buy or hold the same for the benefit of the company or the syndicate.

Therefore, the only question remaining in this case is, should Wesley Dempster be decreed to return the 50 shares of stock to the corporation.

Upon the hearing, I stated that I was inclined to the opinion that the directors of the corporation were without power, in the absence of a contract having been entered into for his services, to vote him the 50 shares of stock in September, 1895. Upon a more elaborate consideration of the evidence and of the authorities, and considering the very peculiar condition of the corporation and the syndicate, and their relation to each other, and considering the status of the litigation then pending in this court, I am inclined to doubt whether this case falls within the rule referred to. 48 Law Rep., Note A 386, and cases cited. At the request of the court, counsel have furnished briefs as to the evidence bear-

ing upon the question of the ratification and acquiescence of the stockholders (owners of certificates of interest) and the acts of the directors, and I have concluded that, whether or not the act of the directors in voting the 50 shares of stock to Wesley Dempster was legal or not, it was one which could be ratified by the stockholders, and one which the stockholders might be estopped to question by reason of their own acts in connection with the passage of the resolution or in connection with the rendition of the services for which the stock was voted. And also that they might be estopped by laches in asserting their right to question the act of the directors, even if the same was illegal.

I am satisfied that the evidence fully justifies the finding of the master, 'that the vote of 50 shares of stock to said Wesley Dempster as compensation for said services, was made of record on the minutes of said meeting of said September 14, 1896; was open to the inspection of all stockholders, and was, in fact, known to all but the owners of a few shares outstanding, and which shares were shortly thereafter purchased by those who had participated in and who had knowledge of said transaction, and that said 50 shares of stock were so conveyed to said Wesley Dempster by said managers without protest on the part of any stockholder, nor was any adverse action taken or protest made until November, 1899, when more than three years had elapsed, a protest was entered of record by R. F. Pettibone against said action. Mr. Pettibone was a stockholder and had acted as attorney and legal adviser of Mr. Lansingh and his associates, and, with his associate counsel, was paid for his services to said Lansingh and his associate by said corporation, in part, by 15 shares of its stock on or about August 26, 1896, and had full opportunity to know what action had been taken in the matter of the stock voted to said Wesley Dempster.

It is true that both Osborne and Pettibone deny they knew of the passage of that resolution at the time of its passage, but their statement as to *when* they first knew of the passage of said resolution is so indefinite as to raise the presumption

(taking into consideration the evidence bearing upon that knowledge) that they must have known of the same within a very few days, and probably within 24 or 48 hours after its passage.

It is not necessary that a stockholders' meeting should be held in order to bind or estop the stockholders in questioning an illegal act of the board of directors. (167 Ill. 549; 165 Ill. 369; 104 Ill. 462; 93 Ill. 153.)

In this case, the directors, Lansingh and others, voted as directors at the meeting of September 14, 1896, in favor of the resolution voting the 50 shares of stock to Dempster. The vote appears to have been unanimous and the directors, with one exception, were stockholders, and, including their own stock and that which they represented, they represented practically all the shares of the holders of the certificates of interest, who, as I have remarked, were the real owners of the corporation and its stock. It makes no difference, except as to creditors, that these directors voted as directors and not as stockholders. They were both stockholders and directors.

Stockholders (leaving out the question of the interest of creditors) are the owners of the corporation; they are the *cestui que* usees for whom the corporation is trustee, and should be estopped by their own acts where any other *cestui que* would be estopped to question the act of his trustee.

But in this case there is no question as to the rights of creditors. The corporation was a solvent corporation and the owners of the certificates of interest were, in fact, the only parties interested in, or damaged, if any damage there was, by the act of the directors.

The stock called the outstanding stock has all been acquired by Wesley Dempster, except a few shares which were acquired by persons who either participated in or acquiesced in the alleged illegal act, and none of the holders of said outstanding stock appear to be seeking to overturn or repudiate the act of the directors in voting the 50 shares of stock.

This suit is brought by the corporation in behalf of, and as representative of, all the stockholders. It is not brought

by, nor could it be brought on behalf of, or by, part of the stockholders. If this stock is returned to the treasury of the corporation, the directors, who were large shareholders and voted for the illegal act complained of, would then be allowed to benefit by their own alleged wrong-doing.

The syndicate that derived such great benefits from the services of Wesley Dempster would be enabled (through the use of the corporation entity as a litigant) to undo an act which they were in equity bound to do, and which, with full knowledge, they acquiesced in and in equity should be estopped from questioning.

I can discover no principle of pleading or practice which would enable the court upon this bill to grant a decree in this case to any innocent stockholder, if any there be, who did not either participate in the illegal act or acquiesce in the same, or who is not in equity estopped from questioning the same by reason of laches in asserting his rights.

If there are any innocent stockholders, a decree dismissing this bill would be no bar to an action by them against the guilty directors.

There are a great many exceptions in this case, but I do not consider it necessary to review each one, as the master has correctly decided all the main questions in the case in favor of the defendant, Wesley Dempster. The equities of the case are so strongly with the defendant, Dempster, that any doubt upon the question as to the authority of the board of directors to pass the resolution voting him the 50 shares of stock should be resolved in his favor.

It will, therefore, be ordered that a decree be prepared overruling each and every exception to the master's report, confirming the master's report, and dismissing the bill, as recommended by him, at complainant's costs, for want of equity."

We have listened to the arguments of counsel for the respective parties hereto, and have examined their printed briefs and arguments, and have come to the conclusion that the opinion of Judge Tuley states the facts and the deduc-

tions to be drawn therefrom so clearly and so correctly, that we cannot do better than to adopt it as the opinion of this court, which we now do.

The decree of the Circuit Court is affirmed.

*Affirmed.*